**Westley B. RAYON and Susan M. Rayon, Appellants,**

v.

**ENERGY SPECIALTIES, INC. d/b/a Air Co. and Heating, Southwest Brick & Fireplace Company, Inc., and Linville Fouts d/b/a Linville Fouts Homes, Appellees.**

No. 2–02–071–CV.

Court of Appeals of Texas, Fort Worth.

Dec. 19, 2002.

8

Payne & Blanchard, L.L.P., Kevin J. Cook, Dallas, for Appellants.

Law Offices of John Frick, John M. Frick, Richardson, Chamberlain, Hrdlicka, White, Williams & Martin, Christine Kirchner, Steven J. Knight, Houston, Newman & Summers, P.C., Frank M. Newman, Jr., Fort Worth, for Appellees.

Panel B: HOLMAN, GARDNER, and WALKER, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

Appellants Westley and Susan Rayon appeal from summary judgments that they take nothing against Appellees Energy Specialties, Inc. d/b/a Air Co. and Heating ("Energy Specialties"), Southwest Brick & Fireplace Company, Inc. ("Southwest Brick"), and Linville Fouts d/b/a Linville Fouts Homes ("Fouts") on their action for damages from a house fire that originated in Appellants' fireplace. We will affirm.

## Background

In 1998, Appellants bought a newly-constructed home from Fouts. One evening, Appellants built a fire in the fireplace, and during the night, they were awakened by smoke from a fire. During the attempt to extinguish the blaze, firefighters tore apart the wall surrounding the firebox, scattering insulation pieces thickly all over the living room, around the firebox, and throughout the house. Appellants escaped from the house safely, but the fire damaged it and some of its contents. On October 18, 1999, Appellants filed suit against Fouts, the homebuilder; Southwest Brick, the firebox distributor and installer; Energy Specialties, the insulation installer; and a third-party defendant, CFM Majestic, the firebox manufacturer.

## Recovery Theories

Appellants filed an amended petition alleging that the fire resulted from Appellees' negligence, manufacturing defects, design defects, vicarious liability, and breach of implied warranties in the construction of Appellants' firebox. Appellants theorized that the fire was either caused by "someone" leaving combustible fiberglass insulation on or around the firebox, which ignited, or that the fire was caused by a defective gas line access sleeve that allowed hot gasses to escape from the firebox and ignite surrounding wall materials.

Fouts and Energy Specialties filed no-evidence motions for summary judgment. Energy Specialties and Southwest Brick also filed a motion for summary judgment on traditional grounds. The trial court granted summary judgment to Appellees

on all of Appellants' claims without specifying the grounds on which the court relied. The order granting Energy Specialties summary judgment was understood to be a final order disposing of all claims of all parties.

CFM Majestic is not a party to this appeal, and Fouts did not file a brief.

## Issues Presented

In Appellants' first issue, they contend the trial court erred in holding that Appellee Southwest Brick was entitled to summary judgment on their negligence, manufacturing and design defect, and implied warranty of merchantability causes of action, because it failed to prove there were no genuine issues of material fact on those claims. Further, in response to each related ground of Southwest Brick's no-evidence motion for summary judgment, Appellants argue that they produced more than a scintilla of evidence that would enable reasonable and fair-minded people to differ in their conclusions.

In their second issue, Appellants contend the trial court erred in holding that Appellee Energy Specialties was entitled to summary judgment on their negligence and implied warranty of construction in a good and workmanlike manner causes of action because Appellee Energy Specialties failed to prove there were no genuine issues of material fact on those claims. Moreover, in response to each related ground of Energy Specialties' no-evidence summary judgment motion, Appellants assert that they produced more than a scintilla of evidence that would enable reasonable and fair-minded people to differ in their conclusions.

In Appellants' third issue, they assert that the trial court erred in granting Appellee Linville Fouts summary judgment on their negligence, vicarious liability, implied warranty of habitability, and implied warranty of construction in a good and workmanlike manner causes of action because Fouts failed to prove there were no genuine issues of material fact on those claims. And in response to each related ground of Linville Fouts' no-evidence summary judgment motion, Appellants argue that they produced more than a scintilla of evidence that would enable reasonable and fair-minded people to differ in their conclusions.

Finally, Appellants insist the trial court erred by granting all Appellees summary judgment, implicitly sustaining Appellees' objections to the testimony of Richard Taylor and David Heldenbrand, Appellants' expert witnesses.

## Standards of Review

### No-evidence Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. TEX.R. CIV. P. 166a(i). The movant must specifically state the elements for which there is no evidence. *Id.; In re Mohawk Rubber Co.,* 982 S.W.2d 494, 497–98 (Tex.App.-Texarkana 1998, orig. proceeding). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* TEX.R. CIV. P. 166a(i) cmt.; *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied); *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 71 (Tex.App.-Austin 1998, no pet.). A fact is "material" only if it affects the ultimate outcome of the suit under the governing law. *Lampasas v. Spring Ctr., Inc.,* 988 S.W.2d 428, 433 (Tex.App.-Houston [14th Dist.] 1999, no pet.) A material

fact issue is "genuine" only if the evidence is such that a reasonable jury could find the fact in favor of the nonmoving party. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford v. City State Bank,* 44 S.W.3d 121, 128 (Tex.App.-Corpus Christi 2001, no pet.); *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.,* 12 S.W.3d 827, 833 (Tex.App.-Dallas 2000, no pet.); *Lampasas,* 988 S.W.2d at 432–33. Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Frazier v. Yu,* 987 S.W.2d 607, 610 (Tex.App.-Fort Worth 1999, pet. denied); *Moore,* 981 S.W.2d at 269. We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore,* 981 S.W.2d at 269.

*Traditional Summary Judgment*

In reviewing a summary judgment granted on traditional grounds, the issue is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Har-*

*rison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *Harwell v. State Farm Mut. Auto. Ins. Co.,* 896 S.W.2d 170, 173 (Tex.1995). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965). The burden of proof in a traditional summary judgment motion is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Rhone–Poulenc,* 997 S.W.2d at 223; *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (Tex.1996); *Great Am.,* 391 S.W.2d at 47. Therefore, in a traditional summary judgment motion, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am.,* 391 S.W.2d at 47.

A defendant is entitled to traditional summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established. *Elliott–Williams Co. v. Diaz,* 9 S.W.3d 801, 803 (Tex.1999). The defendant as movant must present summary judgment evidence that negates an element of the plaintiff's claim. Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged

by the defendant. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

## Summary Judgment Evidence

After the fire, several experts were asked to examine the firebox for causation of the fire. First was Richard Taylor. Taylor had twenty-two years' experience with the Houston Fire Department and spent thirteen years investigating fires as a lieutenant in the arson division. He received 120 hours of classroom training with the Houston Arson Bureau, along with the National Fire Academy, and conducted well over 1,000 fire scene investigations. After leaving the Houston Fire Department, Taylor joined Unified Investigation and Sciences as a special investigator. Appellants' insurer assigned Taylor to investigate the fire, and before he started, he studied CFM Majestic materials covering fireboxes similar to the one in Appellants' home. When he examined the firebox, it had not been moved, but the flue assembly and chimney cap had been removed.

Taylor never tested or analyzed the ashes he found on top of the firebox and was unable to make any scientific determination of what sort of material actually produced the ashes. Taylor did not find any insulation on top of the firebox. Taylor prepared a report in which he surmised that the insulation around the firebox had been in place even before the fire started, rather than having fallen there during the fire or as a result of the firefighters' and inspectors' efforts in tearing out the sheetrock, insulation, flue assembly and chimney cap. Taylor also concluded that the ashes on top of the firebox were actually from insulation that "someone" placed on top of the firebox at some point before the fire started; that the insulation on top of the firebox impeded the ventilation around the area where the flue connects to the top of the firebox; that the impeded airflow caused the area behind the firebox to become so heated that it caused the ventilation-blocking piece of insulation to catch fire; and that the ignited ventilation-blocking piece of insulation caused the wooden studs near the firebox to catch on fire. Nevertheless, in his deposition, Taylor made major concessions:

Q. Was there any insulation on top of the fireplace whenever you actually inspected the fireplace the first time?

A. Just fine ashes.

Q. Did you take any samples of those fine ashes?

A. No.

. . . .

Q. And you don't know if it was even insulation, do you?

A. . . . [N]o, I don't.

. . . .

Q. You don't have . . . an opinion as to whether or not the—some interference with the ventilation aspect was the actual cause of the fire?

A. Could have been, but not conclusively, no.

The next examination of the firebox was done by Robert Bell, whose firm was appointed by the trial court to act as its expert in this matter. Bell holds a Bachelor of Science degree in chemistry and a Master of Science degree in chemical engineering. He has completed advanced studies in corrosion theory, corrosion control, corrosion of ferrous metals, stainless steel, metallurgy, heat treating, high temperature steel, methods for calculating fire and explosion hazards, fundamentals of fire, and explosion hazard evaluation. Bell is a member of the American Institute of Chemical Engineers, National Association of Pipe Coating Applicators, American Society for Testing of Materials, and National Association of Corrosion Engineers. He

has been a failure analyst for Bell Evaluation Laboratory since 1969. As part of his analysis, Bell studied and evaluated the firebox design.

Bell disassembled the firebox to determine if a defect was present that would let fire, hot gas, or heat from inside the firebox get to the outside and ignite the surrounding material. Bell determined that the top right side of the firebox had been exposed to more heat than any other part, but that there was not a contiguous hot path to that area from inside the firebox. Instead, Bell testified the heat came from outside the firebox. Heat damage on the flue collar came from material burning on top of the firebox. Bell found no evidence of hot spots on the outside of the inner firebox and concluded that any heat would have had to conduct through that inner barrier to heat the outside metal cover. Based upon his examination and disassembly of the firebox, Bell concluded there was no defect in the firebox or in its installation which caused the fire.

On behalf of Appellants, David Heldenbrand was a witness to Bell's examination of the fireplace assembly. Heldenbrand is licensed in Texas as a professional engineer and works as a civil and environmental consulting engineer. He has performed numerous failure evaluations of fuel gas fires, explosions, and toxic releases. Heldenbrand agreed with Bell's finding that the firebox was adequately installed and that proper clearances were met. Heldenbrand reported that "[a]ny insulation which may have been found in or around the area of the firebox after the fire did not cause or contribute to the fire." Heldenbrand noticed, however, that a sealed "plug" was visible in the left gas line access sleeve but not in the right one at the time of Bell's examination. And when Bell ignited smoke bombs inside the firebox, Heldenbrand noticed errant smoke

was forced through the right side gas line access sleeve. The reason smoke exited the firebox on the right side and not the left was because a plug was on the left side and no plug was on the right side. As a result, Heldenbrand concluded that the fire was caused by heat escaping from the firebox through the gas line access sleeve on the right side of the firebox. Heldenbrand noted, however, that his opinion was based upon information he had seen at that time and could change if additional information should become available.

After Heldenbrand's report, Robert Evans, another court-appointed expert, examined the firebox and gave specific attention to the gas line access sleeves. Evans holds a Bachelor of Science degree in engineering technology. He is a member of the American Society for Metals, American Welding Society, National Association of Pipe Coating Applicators, American Society for Testing of Materials, National Association of Corrosion Engineers, and Society of Automotive Engineers. Evans is also a Certified Welding Inspector. Evans worked as a quality control/quality assurance inspector and has been a failure analyst with Bell Evaluation Laboratories since 1988. In that capacity, he has been called upon to determine the causes of a wide variety of failures, including mechanical devices, materials, processes, and procedures. He studies and evaluates a product's design and is regularly called upon to offer expert testimony regarding the results of his failure analyses.

Evans reviewed Heldenbrand's report and affidavit, as well as the installation manual for the firebox. He examined both the right and left access sleeves in place and then removed them from the firebox for further inspection. Although it is true that the left side access sleeve did contain a plug and the right side did not, it was plain to Evans that both plugs had been in

place at the time of the fire and that the right side plug had subsequently been removed or simply fell out. The plug in the left access sleeve was found to be a wad of glass insulation that had been melted on one end from the fire outside the firebox enclosure. The insulation plug within the sleeve was not fused, but was intact and unaffected by heat. Smoke and soot stains inside the left access sleeve at the open end stopped at the edge of the insulation plug. The stains marked the distance in from the outside edge that the fire affected the insulation packing. The right side access sleeve had a similar soot stain and mark near its outer end. Evans concluded that the insulation plug was in the access sleeve when the home was burning and that the heat source was outside the firebox enclosure.

Evans further determined that the glass insulation plug serves no purpose if a gas pipe is not installed. Both gas line access sleeves had ceramic knockouts integrally cast into the ceramic lining. The ceramic knockouts completely block the direct path of heat or flame to the exterior of the firebox through the access sleeves. Installing a gas pipe requires that the knockouts be forcibly removed from the inner firebox lining. When Appellants' house burned, neither the left nor the right side ceramic knockout had been removed. As the trial court's expert, Evans stated that Heldenbrand's conclusion that the firebox was defective incorrectly assumes that the insulation plug had never been installed at the factory. The physical evidence contradicts that assumption. Heldenbrand's opinion also incorrectly assumes that the purpose of the glass fiber insulation plug is to form a heat barrier when no gas pipe is installed. Instead, that material is provided as a convenient method of sealing the space around a gas pipe if one is installed within the sleeve. The ceramic knockouts still intact within the firewall completely block the direct path of heat or flame to the exterior of the firebox through either access sleeve. Therefore, based upon close examination, Evans concluded that there was no indication that the access sleeve openings were in any way defective or related to the cause of the fire.

After the fire, Tarrant County Fire Marshal Don Andrews investigated the scene. His investigation did not indicate that insulation had anything to do with the cause of the fire. Instead, "the fire ... resulted either from defect in design of the fire box/chimney assembly or improper installation at the time of construction." According to his written report, Fire Marshal Andrews said, "There was [sic] no other explainable sources of ignition found at or near the point of origin of the fire."

### Analysis

 A non-movant must present by written answer or response in the trial court any issues believed to defeat the movant's entitlement to a summary judgment. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex.1993). Here, Appellants' response to the motion in trial court, as well as on appeal, challenges the summary judgment granted to Appellee Energy Specialties only as it deals with Appellants' negligence and implied warranty causes of action. Accordingly, Appellants have waived the right to argue on appeal the court's granting of summary judgment to Appellee Energy Specialties on Appellants' causes of action for products liability, vicarious liability, or mental anguish. *Id.*

 When Appellants responded in the trial court to the summary judgment motion of Appellee Energy Specialities, they only addressed the issue of whether insulation was the cause of the fire. In that regard, however, Appellants have

failed to present more than a scintilla of evidence through the deposition testimony of their witness, Richard Taylor. Taylor testified that he presumed the ash material he found on top of the fire box, but never tested, was from insulation. Based upon that inference, he testified that before the fire "someone" had placed insulation there (instead of its falling during the fire or during the firefighters' work to extinguish the blaze). Based on those inferences, he infers that the insulation on top of the firebox blocked the ventilation where the flue connects at the firebox top and that the blocked ventilation caused the temperature to become elevated. He finally infers that the blocked ventilation caused the ventilation-blocking piece of insulation to catch fire. Because these compound inferences are speculatory, they are insufficient to prove causation. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex.1968). A party may not establish a vital fact by piling one inference upon another. *Id.* Causation cannot be established by mere guess or conjecture. *McClure v. Allied Stores, Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). The bottom line was that Richard Taylor never tested the ash material, did not know whether it was insulation, and testified that he had *no opinion* as to whether some interference with the ventilation of the firebox was the actual cause of the fire.

### Appellee Fouts

Appellee Fouts did not know Appellants and did not build the home especially for them. Fouts met Appellants when they bought the completed home. Appellee Southwest Brick sold Fouts the firebox and installed it for him in the residence. The fireplace assembly is double-walled. The fireplace assembly was put in place during the very first part of construction. Appellee Southwest Brick was told to set

the firebox flat in a corner, so the framers could frame around it. Appellee Southwest Brick met those instructions and gave Fouts product literature concerning the firebox when it was delivered. Fouts designed the opening into which the firebox was to fit, and he relied on dimensional literature from CFM Majestic in designing the opening. Fouts testified that he designed the opening in accordance with the manufacturer's instructions.

From a review of his invoices, Fouts determined that the wall insulation was completed by Appellee Energy Specialties, which had the responsibility to clean up the job site after spraying the wall insulation. Fouts testified that he personally inspected the firebox area after the wall insulation was finished and that, if there had been any insulation present around the firebox, he would have had the sole duty to clean it out. Fouts also testified there was neither visual damage nor ruptures to the firebox when he inspected it after it was installed.

Appellee Fouts admitted that he retained the sole duty to inspect the area behind the firebox when he testified:

Q. Did you inspect that area at all after the wall insulation was placed?

A. Yes.

Q. What do you remember about that area after the wall insulation was placed before the [s]heetrock was up?

A. If there had been any insulation there inside the box, it would have been—inside the cavity of where the box was at, it would have been cleaned out.

Q. Whose responsibility would it have been to clean that out?

A. Me. Myself.

. . . .

Q. And what do you remember with that?

A. That it all was installed right.

. . . .

Q. When you inspected the fire box after the wall insulation was blown in, did you look behind the fire box?

A. Yes. I would have looked all over the fire box to make sure there wasn't any insulation in there around it.

Q. Why is that?

A. Just as a safety measure.

. . . .

Q. Whose responsibility was it to make sure the area in and around the fire box was clean before the last piece of [s]heetrock went up?

A. It's mine.

Q. Do you feel it was your responsibility to oversee the work that was being done by the insulation contractor?

A. Yes.

. . . .

Q. And between when the wall insulation was installed and the [s]heetrock was installed, you inspected the area where the fireplace occupies?

A. Yes.

Q. And there was no evidence of any insulation on the top—

A. No.

Q. —of the fire box?

A. No.

Fouts' admission that he personally inspected the area behind the firebox after Energy Specialties installed insulation and prior to the installation of the sheetrock conclusively established that Energy Specialties did not place insulation on top of the firebox. The burden then shifted to Appellants to introduce more than a scintilla of evidence that Energy Specialties was negligent. *See* TEX.R. CIV. P. 166a(c); *HBO, L.P. v. Harrison,* 983 S.W.2d 31, 35 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Appellants failed, however, to ad-

dress Fouts' testimony on appeal or in their Response to Energy Specialties' Motion for Summary Judgment. Instead, Appellants argued that *"someone"* placed insulation there. No evidence exists showing that Energy Specialties negligently placed insulation on the firebox. Indeed, Appellee Fouts, who assumed the obligation to inspect Energy Specialties' work, testified that Energy Specialties did everything correctly and did not place any excess insulation on or near the firebox.

### Appellee Southwest Brick

■ Appellee Southwest Brick moved for summary judgment on the following grounds:

(1) The presence of fiber cellulose insulation around the fireplace assembly was the sole cause of the fire at Appellants' residence.

(2) Southwest Brick did not place any insulation on or around the fireplace assembly.

(3) There is no evidence that Southwest Brick placed cellulose fiber insulation around and under the firebox frame.

(4) There was no insulation present when Southwest Brick completed the installation of the fireplace assembly.

(5) There is no evidence that Southwest Brick did not remove large quantities of cellulose fiber insulation from around and under the firebox frame.

(6) There is no evidence that cellulose fiber insulation from around and under the firebox frame became ignitable due to its close proximity to the flue and firebox.

(7) Fouts designed and constructed the opening for the fireplace assembly. As the supplier of the fireplace as-

sembly, Southwest Brick is not strictly liable for any defect in the design or construction of the residence; specifically, it is not strictly liable for the placement of the fireplace assembly with respect to the exterior studs and walls.

(8) The absence of the glass fiber insulation plug in the firebox access sleeve was not a producing cause of the fire.

(9) The plug in the firebox access sleeve was in place at the time of the fire, and there is no evidence that the plug was missing before the fire.

(10) There is no manufacturing defect in the fireplace assembly provided by Southwest Brick which was a producing cause of the fire or Appellants' damages.

(11) There is no evidence of a manufacturing defect in the fireplace assembly provided by Southwest Brick which was a producing cause of the fire or Appellants' damages.

(12) There is no design defect in the fireplace assembly provided by Southwest Brick which was a producing cause of the fire or Appellants' damages.

(13) There is no evidence of a design defect in the fireplace assembly provided by Southwest Brick which was a producing cause of the fire or Appellants' damages.

(14) There is no evidence of a safer alternative design for the fireplace assembly provided by Southwest Brick.

(15) Southwest Brick did not breach any warranty to Appellants.

(16) Appellants are not entitled to recover damages for mental anguish because their claim is based on property damage and there is no evidence of ill-will, animus, or design to harm Appellants personally.

Appellants withdrew their allegations that Appellee Southwest Brick was liable for defects in the design or construction of the residence and for placing the firebox too close to the exterior studs and walls. The trial court granted Southwest Brick's motion for summary judgment, and Appellants do not challenge the trial court's summary judgment in favor of Southwest Brick denying Appellants' claim for mental anguish damages.

The summary judgment evidence shows that Southwest Brick did not place any insulation on or around the fireplace assembly and that no insulation was present when Southwest Brick completed installing the fireplace assembly. Instead, Energy Specialties sprayed the insulation in later and it was responsible for cleaning up the job site after spraying insulation. Appellee Fouts was responsible for cleaning out any insulation then remaining in the firebox area.

In its motion for summary judgment, Appellee Southwest Brick presented to the trial court both traditional and no-evidence grounds. In connection with Southwest Brick's no-evidence grounds, Appellants were required to present enough evidence to be entitled to trial. *See Ford,* 44 S.W.3d at 127–28; *Robinson v. Warner–Lambert,* 998 S.W.2d 407, 410 (Tex.App.-Waco 1999, no pet.); *Lampasas,* 988 S.W.2d at 432. To defeat Southwest Brick's motion, Appellants had to produce enough evidence to raise a genuine issue of material fact on each of the challenged elements. *See Ford,* 44 S.W.3d at 128; *Steinkamp v. Caremark,* 3 S.W.3d 191, 193 (Tex.App.-El Paso 1999, pet. denied); *Lampasas,* 988 S.W.2d at 432.

Appellants pled that Appellees either placed or did not remove large quantities

of insulation from the top of, around, and under the firebox and fireplace frame, in locations where the insulation became ignitable due to its close proximity to the flue and firebox. Appellee Southwest Brick did not place, however, any insulation on or around the fireplace assembly. Rather, it was blown in by Energy Specialties on two separate occasions weeks after Southwest Brick delivered and installed the firebox. Because the insulation was installed later, Appellee Southwest Brick neither owed a duty to Appellants nor had any opportunity to remove the insulation.

Appellants' own expert, Taylor, testified that he found nothing unusual in how the firebox itself was installed. Nevertheless, Taylor had colleague Roger Tate, a mechanical engineer, perform a careful, detailed inspection of the fireplace assembly. Tate did not report to Taylor any problem in the way the firebox was installed. In Taylor's opinion, the fireplace assembly was not installed too close to the exterior wall studs, and the proximity of the firebox to the surrounding studs was not a cause of the fire. The court-appointed expert, Bell, found no defect in the installation of the firebox, which could be blamed for causing the fire.

■ Richard Taylor, Appellants' expert, was not able to identify any manufacturing defect with respect to the fireplace assembly itself that may have caused the fire. Nevertheless, Appellants pled that the firebox and surrounding area were defectively designed and manufactured because they were not manufactured to prevent fires from escaping the firebox. Specifically, Appellants contend that Appellee Southwest Brick failed to install a plug in the gas line access sleeve to prevent hot gasses from being emitted near combustibles. Robert Evans testified that a plug had been in place at the time of the fire, and his testimony was uncontrovert-

ed. The mere fact that an accident happens to a product is not sufficient proof that the product was defective. *Kroger Co. v. Betancourt,* 996 S.W.2d 353, 358 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Taylor also found no problem with the design of the fireplace assembly itself that may have caused the fire. The court-appointed experts, Bell and Evans, agree that the fireplace assembly has no defect that contributed in any way to the cause of the fire.

■ To be competent summary judgment evidence, an expert's testimony must be clear, positive, direct, credible, and free from contradiction. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 466 (Tex.1997); *Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991) (op. on reh'g). In addition, the party offering the expert testimony must meet the standards imposed by the *Robinson* decision. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 552–53 (Tex.1995); *Barraza v. Eureka Co.,* 25 S.W.3d 225, 230 (Tex.App.-El Paso 2000, pet. denied); *see also Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 716 (Tex.1998).

■ There is no difference in the standard for the admissibility of an expert's testimony in a summary judgment proceeding and those applicable at a regular trial. *United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997). The burden of establishing an expert's qualifications is on the party offering expert testimony. *Gammill,* 972 S.W.2d at 718; *Longoria,* 938 S.W.2d at 31. Besides demonstrating that the expert witness is qualified to testify, the proponent must show that the expert's testimony is both relevant to the issues and based on a reliable foundation. *Martinez v. City of San Antonio,* 40 S.W.3d 587, 592 (Tex.App.-San Antonio 2001, pet. denied). The trial court is not required to conduct a *Robinson* hearing

separate and apart from the summary judgment hearing to determine the admissibility of summary judgment evidence from an expert witness. Here, as proponents of expert testimony, Appellants must provide an affidavit that satisfies the requirements of summary judgment practice and that demonstrates the opinion offered meets the requirements of Texas Rules of Evidence 401, 403, 702, and 703. *Hess v. McLean Feedyard, Inc.*, 59 S.W.3d 679, 685 (Tex.App.-Amarillo 2000, pet. denied).

### Appellants' "Experts"

■■■■ The trial court should not consider an "expert" opinion, such as the opinion by David Heldenbrand, based on his assumption of an unproven fact. *Hess*, 59 S.W.3d at 686. As a result of his inspection, court-appointed expert Bell concluded that no defect in the fireplace assembly or its installation caused the house fire. Heldenbrand observed, however, that one of the gas line access sleeves did not contain a plug at the time of the inspection. Based upon that observation, he then concluded that the missing plug allowed the fire to escape from the fireplace assembly through the right side gas line access sleeve and spread to the house. Heldenbrand acknowledges that his opinion was based upon his observations until that time, but that his opinions and conclusions may change should additional information become available. Thereafter, additional information did become available that extinguished the assumptions made by Heldenbrand in formulating his opinions. Cognizant of Heldenbrand's theories, court-appointed expert Evans examined the firebox, paying particular attention to the gas line access sleeves. Heldenbrand's conclusion that the firebox was defective incorrectly assumes that the plug had never been installed at the factory. Although a plug was missing from the right side, it was immediately apparent to Evans that both plugs had been in place at the time of the fire and that the right side plug had subsequently been removed or simply fell out after the fire. The plug in the left access sleeve was found to be a wad of glass insulation that had been melted on one end from the fire outside the firebox enclosure. Smoke and soot stains inside the left access sleeve matched those inside the right access sleeve, plainly showing that the insulation plug was in the access sleeve when the home was burning and that the heat source was outside the firebox enclosure. The physical evidence shown by Evans' inspection destroys the assumption made by Heldenbrand that the plug had never been installed at the factory.

Heldenbrand's opinion also incorrectly assumes that the purpose of the glass fiber insulation plug was to form a heat barrier when no gas pipe was installed. Evans determined that the glass fiber packing plug serves no purpose if a gas pipe is not installed and that this material is provided as a method of sealing the space around a gas pipe if one is installed within the sleeve. The ceramic knockouts still intact within the firewall completely block the direct path of heat or flame to the exterior of the firebox through the access sleeve. Therefore, Evans' subsequent inspection destroys Heldenbrand's assumption that the purpose of the missing plug was to form a heat barrier when no gas pipe is installed.

■■■ An expert's affidavit that is based on assumed facts that vary from the actual undisputed facts has no probative force. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995). Because Heldenbrand's theory was based upon two assumptions that were later conclusively disproved, his opinions are not based on a reliable foundation, and his affidavit and

report do not meet the standards for the admissibility of expert testimony. Also, because they are based on assumed facts that vary from the actual undisputed facts, Heldenbrand's affidavit and report have no probative force. Finally, Richard Taylor's "expert" opinions about insulation causing the fire rely on a series of multiple inferences that are equal to no-evidence. *Kindred,* 650 S.W.2d at 63.

An appellate court reviews a trial court's ruling on expert testimony under an abuse of discretion standard. *Gammill,* 972 S.W.2d at 718–19; *Longoria,* 938 S.W.2d at 31; *Martinez,* 40 S.W.3d at 592. The test for abuse of discretion is whether the trial court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Longoria,* 938 S.W.2d at 31. The trial court did not abuse its discretion in implicitly excluding Heldenbrand's opinions and conclusions.

### Appellee Energy Specialties

Because of Fouts' uncontroverted testimony, which conclusively established that Energy Specialties did not leave any excess insulation on top of or around the firebox, Appellants are unable to establish that Energy Specialties breached any duty of care, proximately caused the fire, or breached any implied warranty. Rather, Appellants have merely asserted that "someone" placed the insulation there, but have not proven the ashes came from insulation. Clearly, this argument does not raise a material issue of fact that Energy Specialties was negligent.

Energy Specialties also moved for and received summary judgment with respect to Appellants' breach of warranty claims. On appeal, Appellants argue that "[i]mplicit in the 'good and workmanlike' standard is the idea of a reasonable standard of skill and diligence." Appellants contend that their "evidence" of proximate cause and

negligence is the report and testimony of Richard Taylor, which they say also raises a fact issue with respect to their breach of implied warranty claim against Energy Specialties. However, because Appellants rely exclusively upon Taylor's testimony to support their implied warranty claim, and because his testimony is no-evidence for the reasons we have already discussed, there is no evidence to suggest that Energy Specialties did anything in an unworkmanlike manner.

Moreover, Appellants' implied warranty claim against Energy Specialties, a subcontractor, is barred as a matter of law. *Codner v. Arellano,* 40 S.W.3d 666, 672–73 (Tex.App.-Austin 2001, no pet.) ("[W]e find no case that implies a warranty of good-and-workmanlike performance from a builder's subcontractor directly to the homeowner.")

### Conclusion

Having carefully considered the entire record and the testimony presented at the summary judgment hearing for each side, we hold that the deposition testimony of Appellants' witnesses Taylor and Heldenbrand was fatally defective for the reasons we have explained. That testimony was overcome by the clear, positive, direct testimony of the court-appointed experts, Bell and Evans, which benefitted Appellees by being credible and free from contradictions and inconsistencies. Significantly, their testimony could have been readily controverted, but was not. Further, Appellants' claim of breach of implied warranty of good and workmanlike performance is, as a matter of law, unavailable to them in the context presented in this case. Finally, the trial court did not abuse its discretion by impliedly sustaining Appellees' objections to Richard Taylor's opinions as a pyramid of inferences that are equal to no-evidence, nor did the trial court err by

impliedly sustaining Appellees' objections to David Heldenbrand's opinions that were without probative force because they were based on assumed facts that vary from the actual undisputed facts.

Accordingly, we overrule each of Appellants' four issues and affirm the trial court's judgment.