

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-029-CV

IN THE INTEREST OF M.M., M.M,
AND M.M., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Rebecca M. appeals the trial court's judgment terminating her parental rights to her three children. In three issues, Rebecca argues that the evidence is legally and factually insufficient to support the trial court's endangering environment and endangering conduct findings and that the evidence is factually insufficient to support the trial court's best interest finding. We will affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Rebecca has been married twice and is the mother of several children. The children at issue in this termination proceeding are MM1, MM2, and MM3, and their father is Randy. Because Rebecca is the only party appealing, we will set forth below the facts pertinent to the termination of her parental rights.

### A.     Adoption of Rebecca's First Two Children

During a prior marriage to John, Rebecca gave birth to two children. Rebecca later divorced John and began dating Randy in 1995.

Rebecca began using drugs when she was eighteen or nineteen years old and started regularly using drugs at age twenty-eight or twenty-nine. Rebecca admitted that she used drugs when her children were ages three and five but said that she did not use drugs when the children were around.

When Rebecca got in trouble with the law around 1999, she thought it was in her children's best interest for them to be privately placed with and adopted by Rebecca's parents, Robert[2] and Gloria. These children are now fifteen and seventeen years old and are not part of the current suit. Rebecca

---

[2] Robert became Rebecca's stepdad when she was three, but she considers him her dad.

has been allowed to see them, but she has never been allowed to be alone with them.

**B.    Rebecca's Second Marriage**

Rebecca and Randy continued their relationship and considered themselves common-law husband and wife.  Rebecca worked outside the home, manicuring nails and cleaning her landlord's house.

Randy admitted using drugs with Rebecca and said that both he and Rebecca sold drugs; however, Rebecca testified that she did not use drugs with Randy but admitted that she sold drugs.  Randy had been using amphetamines since 1992 and had been in jail "a lot of times" for drugs, assault-bodily injury, and robbery.[3]  Randy and Rebecca agreed to not use drugs anymore once they found out that Rebecca was pregnant with MM1.

Rebecca gave birth to MM1 on June 25, 2004.  Rebecca reported that her last drug usage was around December 2004, which indicates that she may have been using drugs when she was pregnant with MM1.  Rebecca, however, later testified that she did not use drugs when she was pregnant with MM1. Rebecca admitted that, after MM1's birth, she cared for MM1 while she had

---

[3] The record revealed that Randy had been booked into jail forty-two times and that he had thirteen separate cases for crimes, including assault-bodily injury, assault with a deadly weapon, robbery causing bodily injury, unlawfully carrying a weapon, terroristic threat, and several drug charges.

drugs in her system; she also admitted that drugs found in her house in 2004 were drugs that she was selling. She said that she did not sell drugs from her house but instead delivered them to people's houses. Based on this conduct, Rebecca was charged with delivery and manufacture of a controlled substance in December 2004 and was jailed in 2005 for possession of marijuana. Randy watched MM1 while Rebecca was in jail.

### C. CPS Enters the Picture

Rebecca continued using drugs and gave birth to MM2 on June 30, 2006. On that same day, someone at the hospital made a referral to CPS because MM2 and Rebecca tested positive for amphetamines.

Jennifer Cook, the initial investigator with the Texas Department of Family and Protective Services (TDFPS), testified that she visited Rebecca at the hospital and that Rebecca admitted that she had used marijuana and methamphetamine with a girlfriend a few days prior to giving birth to MM2. Although Randy tested negative for drugs, CPS placed MM1[4] and MM2[5] in foster care because Randy and Rebecca were living together, which raised the

---

[4] Cook testified that when she saw MM1 on July 1, 2006, he did not appear to have been neglected. MM1 was appropriately dressed, was on target with his weight and size, and exhibited no bruises or developmental delay.

[5] Cook testified that MM2 weighed seven pounds, eleven ounces at birth and that she had a good Apgar score in spite of the drugs in her system.

4

concern that the children would be around drugs. Rebecca told Cook that her parents were not a placement option for MM1 and MM2 because they were already raising two of her children. Rebecca thereafter disappeared.

Three weeks later, CPS returned the children to Randy under a temporary order. TDFPS believed that the children would not have contact with Rebecca because Randy had told them that no one had any contact with her.

**D.     CPS Enters the Picture a Second Time**

Cook attempted a home visit in September 2006, but no one was there, and the phone had been disconnected. Cook also contacted the person that Randy had listed as a babysitter and that person stated that she had never heard of Randy or his children. Because Randy had possession of MM1 and MM2 and because Cook could not find him, she made a referral to a private investigator.

Five months later, on February 9, 2007, the private investigator located the children, along with Rebecca and Randy, in a motel. Rebecca was arrested

on felony warrants,[6] and CPS placed the children back in foster care.[7] Rebecca and Randy gave the children's belongings to CPS and also apparently accidentally included a shredder, an instrument that could read or write checks, and pornography.

Wells visited Rebecca while she was in jail and set up services for her. Wells did not help Rebecca get into First Choice, a program that allows children to be with their mothers while in rehab, because Rebecca was in jail and therefore ineligible for First Choice. Wells also set up services for Randy. Randy refused numerous drug tests, and when he eventually consented to a hair follicle test—which tests for drug usage in the prior three months—in March 2007, it came back with very high positive results for amphetamines and methamphetamine, which shows that he had used these drugs while he had the children with him.

**E.    CPS Enters the Picture a Third Time**

_____

[6] Rebecca had three warrants for her arrest: two for controlled substance possessions that occurred in December 2006 and February 2007 and one for giving a false urinalysis. She has been incarcerated continuously since February 9, 2007.

[7] Shawna Wells, the ongoing caseworker for the children at issue, testified that MM1 and MM2 were age appropriate, that there were no marks on the children, that they were not dirty or malnourished, that they did not have any infections, and that MM1 was potty-trained.

While Rebecca was in jail, she did not tell anyone that she was pregnant. Towards the end of her pregnancy, Rebecca wrote a letter to Randy to let him know that she was pregnant, and it was mailed the same day that MM3 was born.

Wells testified that Randy contacted her and told her that Rebecca had given birth to MM3 in a jail in Galveston.[8] After giving birth, Rebecca signed a power of attorney, asking Monday O'Neal to care for MM3. O'Neal drove down to Galveston to get MM3 and brought her back to Fort Worth.

Wells and other CPS supervisors went to the house where O'Neal was staying. Wells was the first to arrive and saw O'Neal with the baby. Wells noticed that O'Neal's teeth were rotten, that she was very jittery, that she was not clean, that she did not make eye contact, and that she appeared to be a drug user.

Lee Ann Marks, a CPS investigative supervisor, testified that she and another supervisor named Stacey Ladd also went to the house where MM3 was allegedly living. They found MM3 with O'Neal in a house across the street from where Randy was living. The bedroom in which O'Neal and MM3 were allegedly staying did not have air conditioning or baby clothes or a baby crib,

---

[8] The record revealed that MM3 was born July 24, 2007.

and the bed had car parts strewn all over it. Marks noted that there were no baby items in the home.

Ladd went into Randy's home, across the street from where O'Neal was allegedly living, and found baby items in that home. Although Randy had told her that O'Neal cared for the baby and lived across the street, Ladd believed that MM3 was staying with Randy based on the baby items that were found at his house and the lack of such items at the house across the street. Randy later admitted that O'Neal was caring for MM3 at a motel because she did not have a place to live.

While Marks and Ladd were there, O'Neal acted very jittery and nervous, so Marks gave her a drug test. O'Neal tested positive for marijuana, benzoylecgonines, cocaine, and methamphetamine. Because O'Neal had previous criminal and CPS histories and was an inappropriate placement for MM3, CPS placed MM3 in foster care. Although Randy testified that he had known O'Neal for two or three years and that he had never known her to use drugs, Randy told Wells that he was glad that they had come out because he was not comfortable with O'Neal keeping MM3 and that she would be safer in foster care.

F.      Grounds to Terminate Rebecca's Parental Rights

8

CPS ultimately moved to terminate the parental rights of both Rebecca and Randy based on endangering environment and endangering conduct grounds, among others. Wells testified that Rebecca had placed her children in a dangerous environment because she was under the influence of drugs or on the run with the children while she had outstanding felony warrants, demonstrating that she did not provide a safe, stable environment for her children.[9] Wells further stated that she believes that Rebecca's decision to place her baby (MM3) with O'Neal and her decision to use drugs is "not only placing but is allowing the child to remain in conditions or surroundings which endanger the physical and emotional well-being of the child." Wells believes that Rebecca has demonstrated an inability to provide her children with a safe environment due to her drug history (which included giving birth to a baby who tested positive for drugs), criminal history,[10] and incarceration, which also

---

[9] Wells said that she has lost count of the number of places Randy has lived since CPS opened a case on them.

[10] The record revealed that Rebecca was arrested in 2001 for possession of a controlled substance; that she was convicted of the second-degree felony of possession of four to two hundred grams of methamphetamine and sentenced to two years' confinement; that she was charged with delivery and manufacture of a controlled substance in December 2004 when MM1 was six months old; that she was jailed in February 2005 for possession of marijuana; that she was arrested in June 2005 for giving a false urinalysis; that she had been booked into jail twelve times; and that she had seven forgery charges on her record.

constituted engaging in conduct or knowingly placing the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.

### G.  CPS's and the Ad Litem's Recommendations

Wells asked the court to terminate the parent-child relationship, stating that termination was in the best interest of the children.  Wells said it was in the children's best interest for the Department to be named managing conservator so that the children could continue to receive subsidies and asked that the foster parents be named possessory conservators.

Jesus Nevarez, the ad litem, also recommended that the court terminate Rebecca's and Randy's parental rights because the children needed a chance to grow up in a healthy and safe environment.

### H.  Trial Court's Disposition

After hearing the above evidence, the trial court found by clear and convincing evidence that Rebecca had knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children, that she had engaged in conduct or knowingly placed the children with persons who engaged in conduct

10

that endangered the physical or emotional well-being of the children, and that termination of the parent-child relationship was in the children's best interest. The trial court therefore terminated the parent-child relationship between Rebecca and MM1, MM2, and MM3.

### III. BURDEN OF PROOF AND STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and

11

strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, TDFPS must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth

of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573−74. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

13

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1)(D) or (E) and that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### IV. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE OF ENDANGERMENT

In her first and second issues, Rebecca argues that the evidence is legally and factually insufficient to establish that she endangered her children. TDFPS argues that there is ample evidence to support the trial court's endangerment findings under sections 161.001(1)(D) and (E) of the family code.

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), TDFPS had to prove that Rebecca

14

(1) knowingly (2) placed or allowed her children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of Rebecca's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). However, it is not necessary that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet.

15

denied). A factfinder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17. Drug use and its effect on a parent's life and her ability to parent may establish an endangering course of conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133. While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment. *Boyd*, 727 S.W.2d at 533–34; *R.W.*, 129 S.W.3d at 743–44.

The record contains substantial evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of the children. Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *See J.T.G.*, 121 S.W.3d at 126.

16

The record demonstrates that Rebecca had a long history of illegal drug use. Rebecca admitted that she had used drugs, had kept drugs in her house, had sold drugs, and had cared for MM1 while she had drugs in her system. In addition to using illegal drugs, the record reveals that Rebecca had a criminal history that included an arrest in 2001 for possession of a controlled substance; a conviction for felony of possession of four to two hundred grams of methamphetamine; a charge for delivery and manufacture of a controlled substance in December 2004; incarceration in February 2005 for possession of marijuana; an arrest in June 2005 for giving a false urinalysis; twelve jail book-ins; and seven forgeries. The record also demonstrates that Rebecca relied on others to parent her children while she was incarcerated and that the people whom she chose to watch her children were also drug users.

We have carefully reviewed the entire record. Looking at the evidence in the light most favorable to the trial court's findings, giving due consideration to evidence that the trial court, as factfinder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Rebecca knowingly placed MM1, MM2, and MM3 in conditions and engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25; *J.T.G.*, 121 S.W.3d

17

at 124; *In re T.J.*, No. 02-05-00353-CV, 2006 WL 820518, at *6 (Tex. App.—Fort Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that evidence was legally and factually sufficient to support trial court's findings on endangerment due to mother's and father's criminal history and illegal drug use). Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding on environmental endangerment and course of conduct endangerment. We overrule Rebecca's first and second issues.

## V. Termination Was In The Children's Best Interest

In her third issue, Rebecca argues that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest. TDFPS argues that there is ample evidence to support the trial court's "best interest" finding.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the

18

parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Regarding the first factor, the children did not testify at trial. However, the evidence demonstrated that Rebecca has no ability to parent the children and that there is no indication that MM3 even knows who Rebecca is because she had never visited with her. Rebecca has also not visited with MM1 and MM2 because she has been in prison, nor has she sent any letters or cards to the children while she has been in prison. Although the evidence revealed that

19

Randy and Rebecca love their children, the children are "very, very bonded to the foster parents" and call them "mommy" and "daddy."

Regarding the second factor—the children's present and future physical and emotional needs—Wells testified that MM1 and MM2 were age appropriate. The foster mother, however, said that MM1 wanted to sleep on the couch and that MM2 acted like she had never slept in a bed or been in a high chair or car seat. MM1 ate a lot when he first arrived and occasionally still hoards food, and MM2 appeared to be very solemn or in a daze. MM1 and MM2 attend Head Start Monday through Friday. MM3 is being evaluated because she may be below level because she does not sleep through the night. Wells testified that the foster parents are currently meeting all three children's physical and emotional needs and could do so in the future.

The environmental endangerment and endangering course of conduct discussion above addressed the third, fourth, and eighth factors—the present and future physical and emotional dangers to the children, as well as Rebecca's parenting abilities, or lack thereof, and her acts and omissions.

Concerning the fifth factor, Rebecca attempted to better herself while in prison by attending parenting classes, the Christians Against Substance Abuse class, the Voyager's class, the fifty-two week life-changing behavior class, the

Wells class (for disease control), AIDS awareness class, and the CHANGES class to change her way of thinking.

Regarding the parties' plans for the children—the sixth factor—Randy described Rebecca as a "good person" but said that he thinks she has a disease and needs to undergo drug treatment to learn how to control the disease. Randy testified that he does not think that the children should be turned over to Rebecca because she needs to be given a chance to work her program, to be sober, to get a support system in place, and to prove that she is serious about staying clean before she is allowed to take care of the children. Randy told the trial court that it was in the children's best interest for them to be returned to him, but if the trial court chose not to place the children with him, he wanted the trial court to place the children with Rebecca's parents instead of the foster parents because the foster parents had both been married before and had not been married to each other very long.

Rebecca initially told Wells that when she is released in February 2009, she wants to move in with her mother. Rebecca later testified that her plan is to go her friend Karen Morrison's and that she had never planned to go to her mother's house. Rebecca testified that she does not want her parental rights terminated and that she wants to be part of her children's lives, but she admitted that she is "not expecting to get out and be able to have [her] kids at

21

any point in time as of right now." Rebecca asked the court for another chance because she has not ever "really gotten into any kind of program that's set [her] up with the tools [she] need[s], the people [she] need[s, and] the things [she] need[s] to have a network to stay clean." Rebecca would still like to enter the First Choice Program, but she does not want to "put [her kids] through all this anymore." Rebecca therefore asked the court to give the children to Randy because he has a lot of people to help him. If the children could not be placed with Randy, Rebecca said that it was in her children's best interest to be placed with her parents, though she admitted that her mother did not have a bond with MM1 and MM2 as of February 2007.

Wells testified that CPS's plan is for the children to be adopted by the foster parents.

Regarding the stability of the proposed placement—the seventh factor—the evidence demonstrated that terminating Rebecca's parental rights would allow CPS to pursue adoptive placements for the children, which would allow them to have the stability lacking in their current situation.

Finally, concerning the ninth factor—any excuse for the parents' acts or omissions—Rebecca admitted that she regrets the choices she has made, that "[e]verything that's going on right here is [her] fault," that she had the opportunity to change and abused it, and that it is not fair to continue putting

22

her children in danger.  Although Rebecca did not think that using drugs made her a bad parent, she admitted that putting her children in danger makes her a bad parent and that she had done nothing to show the court that she deserved her three children back.

Giving due consideration to evidence that the factfinder could have reasonably found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Rebecca's parental rights would be in the children's best interest.  *See In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed that termination of father's parental rights was in child's best interest where, among other factors, father was incarcerated at time of termination hearing and had a pattern of criminal and violent conduct). Accordingly, we hold that the evidence is factually sufficient to support the trial court's best-interest finding.  We overrule Rebecca's third issue.

## VI.  CONCLUSION

Having overruled Rebecca's three issues, we affirm the trial court's order terminating her parental rights to MM1, MM2, and MM3.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, HOLMAN, and WALKER, JJ.

DELIVERED:  December 11, 2008