

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00345-CV

IN THE INTEREST OF A.W.

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant J.S.M. (Father) appeals the termination of his parental rights to his child, A.W. (Alice).[2]  We will affirm.

## Background Facts

Mother and Father met in late 2008, in North Carolina.  Mother already had one child from a previous relationship, A.S. (Ann).  Father told Mother his name

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and all real and fictional names of the parents throughout this opinion.  *See* Tex. R. App. P. 9.8(b)(2).

was "Randal Washington." At that time, Father claimed to own a "C&C business" that cut wood for cabinets and a pressure washing business.

Mother and Father broke up twice because "finances were bad." The first time she left "without discussing it with him" because she was "sort of scared of him." The second time Mother left, Father saw her packing and "grabbed [her] by [her] neck and [sat her] down, sort of forcefully" and "[her] head had hit the wall." Mother left him and moved back in with her parents. After Mother found out she was pregnant, she and Father started talking again and eventually she moved with him to California where Father claimed he was working as a computer technician for General Electric. Father told Mother that he was also working as a special agent for an international intelligence agency. Father told Mother that she was not allowed to see what he was working on, but he would do his secret work on their home computer at night while she was sleeping. He would sometimes "go a couple of days with no sleep," and he spent almost all of his day working on the computer.

Alice was born in California in December 2009. In April 2010, Mother and Father moved to a rental house in Garland. Father did not have a job, but he planned on starting a business selling computers that he built. He had a stock of nine computers that he had built for sale. Mother attempted to get a job, but Father would not allow her to work outside the home.

"Less than a few months" before their arrest, Mother noticed that Father had begun a fascination with gunpowder and homemade rockets. Father bought

2

two Glock pistols for $1,800 because, as he told Mother, he wanted to start working as a police officer while the computer business was getting started. He bought the guns from a friend who was a police officer in Frisco. Mother was upset that Father was spending money on guns instead of on rent.

One day, the landlord, an "elderly man," came to the house to talk to Father about evicting him for failing to pay rent. Father hit the landlord, whom Mother later saw crying. After being evicted from their house in Garland, the family moved to the Fairfield Inn in Plano, where they lived for "a couple months." While in the hotel, Mother said that Father only spoke of his spy agency work to mention that he was considering "quitting." Two days before they were arrested, Mother and Father moved out of the Fairfield Inn because they were a "week or two behind" in paying their bill. Since they had no money to move into another hotel, the family was living in Father's black Ford F-250 pickup truck at the time of the arrests. They put their belongings, except for what they packed in the truck, into a storage unit in Plano. Father told Mother he was going to pack office supplies to take with him and some gunpowder to "test something."

On August 24, 2010, a police bulletin went out to Denton police officers regarding a black Ford F-250 pickup truck with a license plate reading "THE KNG." The people driving the truck were suspects in an unauthorized use of a

motor vehicle and theft of service investigation.[3]  Two Denton police offers were in a parking lot of a Denny's restaurant "a little after midnight" when they saw the truck pull into the lot.  Father exited the truck and headed towards the officers. He was "dressed in a black T-shirt, black BDU pants, and combat boots." Because the bulletin had cautioned that the suspects were armed, the officers drew their weapons and commanded Father to get on the ground.  Father complied and, during a frisk, was found to have a pocket knife on his person. One of the officers, Sergeant Matthew Cain, ordered the driver, who turned out to be Mother, to exit the truck too.

Cain looked in the passenger compartment of the truck and found the two children.  In the bed of the truck, Cain found chemicals, $CO_2$ cartridges, pipes, canon fuses, "containers . . . labeled smokeless powder and muzzleloading propellant," "primers" for reloading pistols and small rifles, grenades, plumber's putty, and other objects.  Cain described the items as "components for making a bomb."  There were also a number of handwritten prescriptions written out to Mother.    Inside    the    passenger    compartment,    Cain    found    two    Glock semiautomatic pistols and "an assortment of badges that mimicked a legitimate federal agency."  One pistol was under the front passenger seat where Father had been sitting, disassembled.  The slide and barrel of the pistol were in the

---

[3]The truck had not been stolen.  The bulletin also warned that the suspects had rifles, which was also not true.  There was no evidence regarding the source of the information in the bulletin.

unlocked glove compartment. The other pistol was in a backpack on the front passenger floorboard. It had ammunition in the magazine, but no round in the chamber. Father did not have a license to carry a concealed weapon.

Father was arrested that night, and the family was taken to the police station.[4] Cain testified that Father was "uncooperative, very adversarial, [and] argumentative." Child Protective Services (CPS) was notified and sent Jamie Beasley, a CPS investigator, to the police station to interview Mother. Mother told Beasley that Father worked for the "IIA," which she described as a "black ops group." Mother also told Beasley that the prescriptions in her name were for hydrocodone for Father's back pain. She claimed to have no knowledge of any of the objects in the bed of the truck except for "a little Ziploc of gunpowder" she thought he packed. She said that Father had only started amassing the items found in the truck within the previous six months. Mother was arrested at the station for child endangerment and CPS took the children because, with both parents in custody, there was no caretaker for the children. The children were placed in foster care.

Julie Westlake, a CPS supervisor, visited Father in jail. He introduced himself as Randal Washington. Father told Westlake that he worked for "the

---

[4]Father was charged with child endangerment. Mother believes he was charged with crimes stemming from his false identity. He was also later charged in federal court with possession of an unregistered firearm, possession of a firearm by a fugitive of justice, possession of a firearm by a prohibited person because of a domestic violence misdemeanor in Oklahoma, and false personation of an officer or employee of the United States government.

5

national security" and that if he could call the CIA, they would be able to clear up this "misunderstanding." He explained his criminal history was the result of an undercover operation in Arizona and that the ID badges in the truck were a part of that operation. He told Westlake that he had "military training in explosives," but he would not describe the training. He also said he was teaching Ann to shoot BB guns.

The police eventually discovered that Randal Washington was not Father's real name and that he was on probation in North Carolina. Father's only excuse for the fake name was that "his family had called him [Randal Washington] since the time he was five or seven and that it stuck, and so he's always gone by [Randal Washington]." Mother also learned that—in addition to the ex-wife and children Father had told Mother he had but whom he had refused to let Mother contact—Father had an ex-wife in Oklahoma whom he had married under his legal name.

Mother pleaded guilty in order to get her children back, and she received five years' probation.[5] Father refused to complete any services and refused to sign his family plan review so that CPS could file it with the court. CPS filed to terminate Father's rights to Alice. After a bench trial, the trial court found by clear and convincing evidence that Father (1) knowingly placed or knowingly allowed Alice to remain in conditions or surroundings that endangered her physical or

_____

[5]The children were returned to Mother on a "return and monitor."

6

emotional well-being; (2) engaged in conduct that endangered Alice's physical or emotional well-being; (3) constructively abandoned Alice; and that termination of the parent-child relationship is in Alice's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (2) (West Supp. 2011). This appeal followed.

### Standard of Review

Father challenges the legal and factual sufficiency of the trial court's findings. A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp.

2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the

8

finding.  *Id.*  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.  *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province.  *Id.* at 573, 574.  And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.  *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own.  *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated (D), (E), and (N) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

## Discussion

## I. Grounds for removal

In his first two issues, Father argues that there is legally and factually insufficient evidence to support the trial court's finding that he knowingly placed or knowingly allowed Alice to remain in conditions or surroundings which endangered her physical or emotional well-being. In his third and fourth issues, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that he engaged in conduct which endangered Alice's physical or emotional well-being. In his fifth and sixth issues, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that he constructively abandoned Alice.

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parents' conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d

10

at 125.  The specific danger to the child's well-being may be inferred from parental misconduct standing alone.  *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth.  *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

## A.  The evidence

### 1.  The false identity and intelligence agency

Father was indicted by a federal grand jury for a violation of 18 U.S.C. § 912 for false personation of a federal officer or employee.  Father had no reservations about this claim, even using his fictitious name and claim of membership in an international agency with the CPS worker who interviewed him.  Tracy Murphree, a Texas Ranger, testified that if he had been at the scene, it would have "raise[d] [his] alarm a great deal" to discover that Father had fake badges for an intelligence agency.  As he explained,

> If someone believes that—police officers or federal agents could be granted access to a number of areas or to a number of people, if people believe or are under the assumption that they're a federal agent or a police officer.
>
> Someone who is pretending to be that and is in possession of this type of stuff could pose a threat to many different areas.

In fact, Mother testified that Father, a person who was a fugitive from justice and on probation, was able to buy the two Glock pistols from his police officer friend

11

because the friend believed Father was some sort of secret agent, and he hoped Father would join the Frisco police force.

Mother testified that she now believes that she did not even know the man who was the father of her younger child. She did not know his true name, that he was on probation in North Carolina, or that he had two ex-wives. She had believed his stories about working as an intelligence agent. While she testified that prior to the arrests, she did not believe he would deliberately harm the children, after learning the truth about Father and the extent of his possession of bomb-making components, she understood that, in fact, the children were in danger.

Father was dishonest with CPS in regard to his name, his background, and his profession. Beasley testified that Father's dishonesty was a problem. CPS was unable to do any background checks on Father until it found out his real name. Mother was unable to protect the children because she did not know the truth about Father's identity or employment. He told the CPS supervisor, Julie Westlake, that he worked in national security. He said that his arrest was the result of a "big misunderstanding" and that if he could call the CIA, he could clear it up. He told Westlake that he had a criminal history, but only because he was arrested while "undercover in Arizona on a motor vehicle operation." He told her that he had military training in explosives but refused to explain what that training was. Once CPS discovered Father's real name, he explained that his family had called him Randal Washington since he was young so he has "always gone" by

Randal Washington. This testimony conflicts with the divorce documents from Oklahoma referencing Father by his true name. However, this did not explain why he did not tell anyone about his real name, why he maintained a false identity with Mother, even giving their child his false last name, or why he had identification under the fake name and no identification with his legal name.

There was no evidence that the "IIA" is a legitimate intelligence organization or that Father actually worked for any sort of national security agency. Mother testified that she never saw any paychecks or any kind of documents demonstrating Father's affiliation with the organization. If Father purposefully lied about the "IIA," the trial court could have believed that Father was dangerous because he was dishonest with his wife, his friends, the police, and CPS. *See In re S.K.*, 198 S.W.3d 899, 906–07 (Tex. App.—Dallas 2006, pet. denied) (upholding finding that Mother engaged in endangering conduct when, among other things, several witnesses testified as to her dishonesty). If Father did work for this agency, the trial court could have believed that Father was a danger because he conducted his secret spy work from the home. If Father actually believed he worked for the nonexistent agency, the trial court could have believed that Father had lived in a fantasy world and not in reality. Under all of these scenarios, Father's statements were not supported by any evidence, and the trial court was free to disbelieve him.

13

## 2. Instability

Father spent $1,800 on guns he was not legally allowed to own instead of paying rent for the family's house. Because of Father's actions, including his refusal to allow Mother to work outside the home to supplement his income, the family had to move into a hotel and then their truck. Jaime Beasley testified that this nomadic lifestyle was dangerous to the children because "[t]he children did not have a stable environment to live."

Mother testified that there were problems in their relationship throughout the approximately two years they had been together. The issues included financial problems stemming from Father's lack of employment, housing, and transportation, and his unwillingness to allow her to work. She also testified to "anger problems that were there in the relationship." She specifically described an instance of physical abuse on her by Father and repeatedly, throughout her testimony, described herself as scared of him.

Mother's testimony described the unstable and somewhat nomadic lifestyle they lived with their children. Because of the frequent moves the family made, Mother could not keep her older child Ann in school. As a result, Ann was behind in her math and reading skills and had issues dealing with her peers while in foster care.

The testimony of all the witnesses showed that the children appeared to be well cared for at the time of the parents' arrests. This fact cannot, however, be credited to good parenting by Father. Mother testified that Father did his secret

spy work at home, staying up for days at a time working on his computer and as a result, "[she] ran all the errands and took care of the kids and did the chores, took care of everything else so he could work."  Father's own counsel confirmed through his questioning of Mother that the problems the children were having were because of the "bouncing back and forth between hotel rooms and jobs" were problems Mother had to work to correct.  He asked,

> Q  And in fact, that's the reason why you were taking those extra steps as a mom to make sure those children were still well cared for, correct?

> A.  Correct.

> Q.  Well fed, well clothed, medical problems, there weren't any, correct?

> A.  Correct.

The terminal event in Father's endangering course of conduct occurred on the night of his arrest.  The Denton police had received a bulletin warning that Father, dressed in military clothing, was to be considered armed and therefore dangerous.  When he reached the parking lot where he was arrested, Father exited his vehicle and began to approach a police patrol car at a fast pace, which caused the officers on the scene to suspect "some ominous thing that might be fixing to happen."  After the police ordered Father on the ground, they kept their guns drawn and approached the vehicle in which Father had arrived, and they found Mother and her two children.  Mother described how the officer approached her with his gun pointed at her face and yelled very loudly.  She

15

further described how the children awoke in the middle of the night to this scene, surrounded by police and firefighters. This event itself was the culmination of Father's deceit and dangerous conduct.

### 3. The weapons

Father did not dispute that he had two semiautomatic pistols "probably no more than four feet" from where the children sat in the truck. Although one pistol was disassembled, the other had ammunition in the magazine and was found in a backpack on the front floorboard. Cain testified that it would not be difficult for a six-year-old child to cycle the pistol's slide to put a bullet in the chamber of the gun. Murphree also testified that a six-year-old child would have the strength to load the pistol. Beasley also believed that the gun could have been a danger to the children because Ann could have had access to it. CPS caseworker Rebecca Martin testified that Ann was a very active child who often got into things she was not supposed to touch, such as Martin's purse and a gift bag.

Father also did not dispute that he did not have a license for the weapons or that he acquired them from a friend who believed that Father was an international intelligence agent. Westlake testified that committing a felony in the presence of a parent's child constitutes neglectful supervision as does placing a child in a dangerous situation because the child "could be harmed or injured based on [the parent's] behavior or . . . actions." Westlake did testify that there was no evidence that the children had been left alone with the weapons.

### 4. The items in the truck bed

Cain testified that he found the items in Father's truck worrisome because "they're components for making a bomb." He believed the items could cause harm to Alice and Ann. He did admit that the items could be purchased at various stores and individually, "in and of themselves," they were not dangerous. But he also testified that harmless objects could be put together to make dangerous explosives "within a few minutes." Westlake also testified that "[t]here are concerns for children's safety when they're around things like ammunitions and chemicals." She expressed concern that the children had access to guns and that they could ingest the chemicals found in the truck.

Texas Ranger Murphree also testified that the items were a concern because, as he stated, "You have all the elements here to create some very powerful and deadly bombs." He said that the grenades were dummy grenades but that they could be made into live grenades by adding pellets and a fuse, both of which were found in the truck. Murphree also testified that the pellets could be used as shrapnel for a pipe bomb. He did not believe that someone with those items was just playing with rockets and fireworks. Murphree admitted that, individually, there were other possible purposes for the items found in the truck, but he could think of no other reason someone would have all the items found in Father's truck except to make bombs. He said that as a Texas Ranger, if he had come upon the truck and had seen the items in the bed, he "would immediately back out and [he] would call a bomb squad to come in and take care of that

17

situation." He believed that a parent who possessed the type of items found in the truck was "absolutely" a threat to the health and safety of his child.

Cain testified that the muzzleloader propellant and percussion caps are used by hunters during deer season, but Mother testified that Father was never interested in guns until a few months before their arrest, and there was no testimony that Father was a hunter. Cain testified that the "blanks" found in the truck could be used "for a device that's used to set nails in concrete" and that the pipes and plumber's putty could also be used in home construction. But there was no testimony that Father was involved in any home construction projects.

### B. The evidence was legally and factually sufficient to support termination under (E).

Cain testified that he believed that Father had placed the children in danger

> [f]or [sundry] reasons. One is that he had reportedly been claiming to be a federal agent, and he's walking around with fictitious badges and I.D. cards purporting that, as well as being armed.
>
> Then on top of the [sundry] explosive components that he had in the vehicle, I think there's some real threats to their physical well-being with what we came across that night and the items in that vehicle and the behavior that he had been exhibiting.

Based on what he observed the night of the arrests, Cain believed, based on his thirteen years of law enforcement experience, that the children were at risk of harm. Westlake testified that taken as a whole, the items in the truck, Father's deception, and his actions led her to believe that the children were in danger and could be harmed physically, emotionally, or psychologically. Mother testified that

18

she believed her children had suffered because of Father's actions. The CPS caseworker, Rebecca Martin, also testified that she believed that Father's conduct endangered the children. Lori Powell testified that CASA believed that that Father was endangering the children and that "being involved in such an unstable lifestyle, being subject to police intervention and arrest was not a suitable environment for either of these children to be living in."

As stated above, an actual injury does not have to happen before a child can be permanently removed from an endangering parent. *See Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. Although Father had not yet built a functioning bomb at the time of his arrest, the trial court could believe that Father had put the materials in the truck (instead of storing them in the family storage unit) because he intended to build one imminently. Considering that the family had been living in a hotel and then a truck, and that Father's work history consisted of computer building and some fence building, the trial court was free to believe that Father was not involved in home construction projects that necessitated setting nails into concrete or fixing plumbing. The trial court was free to believe that the items in Father's truck were not for separate projects or that, only by mere coincidence and happenstance, had wound up in proximity to each other. The trial court could believe that the items had been collected together for the purpose of constructing a pipe bomb and that Father had no other purpose for items except for building such a bomb. That Father collected the items and weapons over a span of six months and that he continued for at

least a year to tell others he was an agent of the "IIA" is evidence of a voluntary, deliberate, and conscious course of conduct. *See J.T.G.*, 121 S.W.3d at 125.

Further, Father's frequent uprooting of the family is conduct that "subjects a child to a life of uncertainty and instability" and endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Father lied about his identity and employment for years. Under this guise of being an officer of an intelligence agency, Father procured weapons and the "elements . . . to create some very powerful and deadly bombs," which he carried around in the vehicle in which his family was living. Although it is unclear why Father engaged in this façade, the trial court could have believed that Father's preoccupation with fireworks, guns, explosions, and grenades could prevent Father from protecting the physical and emotional well-being of Alice. *See In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) ("[A] parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child."). In addition, the trial court could have believed that Father's focus on his spy work on the family's home computer (where he would sit for "over 90 percent of his time" and sometimes for a few days without sleep) interfered with Father's ability to secure employment and provide for the family. Father spent $1,800 on pistols instead of rent, forcing the family to move from its house into a hotel room.

The clear and convincing evidence supports the trial court's finding that Father engaged in a course of conduct that endangered Alice. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's termination findings under subsection (E). We overrule Father's third and fourth issues. Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is necessary to support a judgment of termination, we need not address Father's first, second, fifth, and sixth issues. *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

## II. Best interest

In his seventh and eighth issues, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in Alice's best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

21

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) guidance and supervision consistent with the child's safety;

    (D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)  any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when

23

appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## A. The evidence

Alice was just nine months old at the time of her parents' arrest and twenty-one months old at the time of trial. *See* Tex. Fam. Code Ann. § 263.307(b)(1). Because of Alice's young age, she is unable to express any fear of returning to her home. However, Mother testified that she feared Father. She said she knows "what [Father is] capable of" and she described it as "scary." *See id.* § 263.307(b)(5). Although Mother believed that Father would not purposely hurt the children, based on his past acts, she did not know if Father would be able to put Alice's safety first.

Father was imprisoned throughout the case and refused to participate in services, so he completed no psychiatric evaluations. *See id.* § 263.307(b)(6). However, because there was no evidence to support Father's assertions that he was a "black ops" secret agent, the trial court could have had concerns for Father's mental state or health.

Both Beasley and Westlake testified that there was no indication of neglect or physical or sexual abuse. *See id.* § 263.307(b)(7). The indictment in Father's pending federal criminal case, which was submitted into evidence in this case,

24

showed that Father had been convicted of domestic violence in Oklahoma. Mother testified that Father was never abusive to her or the children, but she also testified that he once grabbed her by her neck and threw her so hard onto the couch that she hit her head against the wall, which scared her. She also recalled Father punching their elderly landlord and leaving the man crying when the landlord had come to talk to them about late rent.

Beasley testified that the initial report she received from CPS did not indicate any concerns for drug use. *See id.* § 263.307(b)(8). Mother testified that Father was taking hydrocodone for back pain on a regular basis and "an antidepressant to be paired up with the hydrocodone." She also said that Father also had either Xanax or a muscle relaxer. Father got the prescriptions by going to a doctor every month, except for the Xanax, which Mother admitted was not legitimately prescribed to him. Mother testified that Father abused the hydrocodone on "bad days."

The CPS caseworker said that Father did not want to work services because he did not want CPS involved in his private life. *See id.* § 263.307(b)(10). He questioned why CPS would want to see his home or verify his employment. He told CPS that he did not understand how the services— including a psychological evaluation, drug assessment, and counseling—were going to help him be a better parent. He said he would do the services "to check the box," but he never completed any services. Although there was no evidence of what services were available to Father in the jails in which he was

25

incarcerated, he did have the ability to write letters to his children or to call CPS. CPS never received any communications from Father. There was no evidence that Father attempted to participate in any type of parenting or educational services through the jails.

CPS gave him a form to fill out with the names of family or friends who could care for the children while the parents were incarcerated. Father told CPS he wanted the children to be placed with Mother's parents or his grandparents, but he could not give CPS his grandparents' names or address. In December 2010, Father told CPS that he wanted to relinquish his parental rights, but he never signed any required form to accomplish this. In March 2011, the CPS caseworker brought Father the family plan that CPS needed to file with the trial court. Father refused to look at it, discuss it, or sign it.

Mother testified that she has not "seen anything as of yet to show or prove that he knows what he did is not right [or that] he wants to be a better person." See id. § 263.307(b)(11). Rebecca Martin, the CPS caseworker, testified that Father was "very resistant to being involved in this case. He was very uncooperative, but he was very focused on explaining every detail of the night of the . . . 24th of August." He expressed to Martin no concern that the flammable items in the truck could have been a danger to the children. He told Martin that he did not think CPS had a right to have a case open against him, so he did not want to work services. Lori Powell of CASA testified that Father "did not indicate

that he felt responsible for the situation that they were in or that he had any remorse over it."

Cain testified that he saw no evidence that the children were dirty or needed any medical attention. *See id.* § 263.307(b)(12)(A). Beasley also testified that the children were appropriately dressed, appeared well nourished, and their appearance did not "trigger any concerns." Cain also testified that there was no evidence that the children were being physically mistreated. *See id.* § 263.307(b)(12)(B). Mother testified that her older daughter was behind in math and reading skills and that she had been homeschooling her because of the frequent moves. Mother said that Ann would have "[d]efinitely, definitely" been in school had they lived in a stable home with a stable income. Martin testified that Ann frequently lied, and Martin believed that Ann's behavior was the result of watching Father "lie, be manipulative, and deceive people on a daily basis."

Mother told CPS that she and Father had been teaching Ann "simple gun safety, to stay away from guns," but that they had not taught Ann how to shoot them. *See id.* § 263.307(b)(12)(C). At trial, Mother testified that Father was teaching Ann to shoot a BB gun. Westlake also testified that Father told her that he had taught Ann to shoot a BB gun. Cain testified that Ann had said she knew how to shoot a gun, and that caused him concern.

Beasley testified that there was no evidence that the hotel rooms were dangerous living circumstances. *See id.* § 263.307(b)(12)(D). However, she also testified that moving the children from hotel to hotel and living in the truck

27

was a dangerous, unstable environment. Powell also testified that the children's emotional well-being was affected by "being involved in such an unstable lifestyle."

The CASA advocate testified that Mother has demonstrated throughout the case that she can be successful in raising the children on her own. *See id.* § 263.307(b)(13). Mother receives child support from Ann's father to care for Ann. Mother's family has supported Mother emotionally and financially throughout this case. Mother believes she can raise Alice without financial support from Father. Mother said, "[T]hey're in my care now, and I want to take the best possible care that I can of them and not put them at risk for anything ever again. They've suffered enough." She believed she has the ability to care for the children on her own.

Martin testified that she believed it was in Alice's best interest to terminate Father's rights because he "has not completed any services to better his parenting skills and ability to care for these children" and because he has no acceptable plans for a living arrangement or employment. Mother testified that she believed termination of Father's rights was in Alice's best interest. She said,

> It's—like everything about this case, it's the combination of everything that makes it hard to—like, I wonder why all this had to happen with kids involved.
>
> A single man, sure, go play with model rockets, and, you know, I don't care. Just—but we had children in the home, trying to make a family work, trying to get financially stable; and he's got a fake name, false identifying, he works for an agency, refusing to get

28

a job, and then to top it off with all this stuff in the home.  And myself or anybody else, we still don't know why this was.

So I would want to keep my children in a safe, stable, trustworthy home so they don't have anything to be afraid of.

## B. The evidence is legally and factually sufficient to support the best interest finding.

The State presented three witnesses who testified they believed that termination was in Alice's best interest, and no witnesses testified to the contrary. Father made no attempt to participate in services or to communicate with his daughter at any time during the year this case was pending.  *See In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (upholding best interest finding when father had not attempted to seek information about his daughter's well being and had not sought services that might assist him in improving his parenting skills); *In re J.L.R.*, No. 11-05-00094-CV, 2006 WL 728069, at *2 (Tex. App.—Eastland Mar. 23, 2006, no pet.) (holding evidence legally and factually sufficient to support best interest finding when father had limited contact with child and was currently incarcerated).  He has a history of violence and recently became interested in guns and explosives.  *See V.V.*, 349 S.W.3d at 558 (upholding best interest finding because trial court "could have inferred that the father's consistent, and at times violent, criminal conduct would put a child in his custody in emotional and physical danger now or in the future").  He has expressed no concern over having the weapons and chemicals in the same truck in which his children had to sleep because he spent the family's rent money.  He prohibited Mother from getting a job and kept her isolated from

friends. He has unapologetically lied to the police, CPS, and his own wife about his employment, his identity, and his background. *See In re M.H.*, 319 S.W.3d 137, 151 (Tex. App.—Waco 2010, no pet.) (upholding best interest finding because mother's repeated lies about non-existent medical conditions caused the children to "suffer[] emotionally and physically"). Seven months before trial, Father told CPS that he wanted to relinquish his rights to Alice. *See In re T.M.J.*, 315 S.W.3d 271, 278–79 (Tex. App.—Beaumont 2010, no pet.) (upholding best interest finding when, among other things, mother's counselor testified that mother "expressed little concern about the children, lacked interest in them, lacked motivation to help herself or the children, and that at one time, . . . [she] expressed the belief that the children should not be returned to her").

Based on the evidence presented at trial and considering the relevant statutory and *Holley* factors, we hold that, in light of the entire record, the trial court could have reasonably formed a firm conviction or belief that termination of Father's parental rights to Alice was in Alice's best interest. Accordingly, the evidence in the record is both legally and factually sufficient to support the trial court's best interest finding. We overrule Father's seventh and eighth issues.

**Conclusion**

Having overruled all of Father's dispositive issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

DELIVERED: March 22, 2012